Good morning, Judge Fletcher, Judge Nelson, and Judge Bates. Good morning, Judge Fletcher, Judge Nelson, and Judge Bates. Good to argue before you for the first time. These cases arise from... Could you please identify yourself for the record? I mean, we know who you are, but the record doesn't... I'm sorry, my name is Stephen Yagman, and I represent the plaintiffs in both of these cases. These cases arise from racial riots at the Los Angeles County Jail. Today, just six days short of five years ago, the riots occurred on April 20th and 21st in the year 2000. There is evidence in the record from Los Angeles County Deputy Sheriff Edgar Capofali, C-A-P-A-F-A-L-I, that the jail knew that these riots would occur and then didn't take any precautions to do anything to see that they wouldn't occur. And the information that the jail had was twofold. One, the population of the facility in which this happened up in Saugus was much greater Mexican-American than African-American, and in the riots, basically what happened is that Mexican-Americans beat the dickens out of black inmates at the facility. Afterwards, the jail system investigated thoroughly what happened in these riots. The point here is, and the point that I'm making by saying those two things is this. The purposes of the PLRA exhaustion requirement are met by those things having occurred. These cases are neither frivolous, which is what the PLRA is directed against, nor does the PLRA apply with respect to many of the plaintiffs who were out of custody at the time they filed the action, nor does it apply because the jail system got an opportunity to do what the exhaustion requirement of the PLRA is aimed at, and that is to give the institution the first shot at looking at what happened. The jail investigated this carefully, and as is indicated in the Rule 28J submission I made this week, in the case of Ngo versus Woodford, I think everything that the plaintiffs had to do was met. Now, the Ngo case seems to me to say that there's no, as it were, statute of limitations. It doesn't say much beyond that, does it? I think it doesn't say much beyond that, but I think what's important about the Ngo case is that it sets forth how the PLRA came into existence as a rider to an appropriations bill that was proposed by Senators Hatch and Dole, and that though the common experience of lawyers who litigate these cases is that the PLRA exhaustion requirement is there very clearly as a hurdle to prevent plaintiffs in Section 1983 cases from suing in prison litigation cases, I think Ngo is important for the proposition, but that's not what it was said to be. Now, let me cut to the chase. Part of your argument, I think, is that it's sufficient to exhaust under this statute to send a letter to Sheriff Baca? Yes, it is. Now, to take an analogy, let's say that I'm working as maybe a civilian employee of the United States Defense Department. I've got a complaint, and there's an established procedure under which I should do my administrative complaints. But I decide I don't want to do that, and I just send a letter to Secretary Rumsfeld. Am I properly exhausted? It depends on the circumstances. Are you still working at the Defense Department? Most of these plaintiffs weren't there anymore. The county jail system is a way station, much more than it is a place of confinement for people convicted of crime. Well, let's start out with people who are still in the jail. The people who are still in the jail are part of the Bayonne case. And after they were out of the jail, they then filed their grievances. I think that both classes of plaintiffs, that is, those who were in the jail, to which you just referred, Judge Fletcher, and those who were out, one way or another, satisfied the requirement, because the requirement is to give the jail an opportunity. But the requirement, as the jail sets it up, is to do it in a specific way. Well, I don't think that means that the people have to do it in that way. In other words, it's not a requirement. I don't think it is a requirement. I think the requirement is in the PLRA. Even if the jail people say this is how you have to do it, even then it's not a requirement. That's correct. In other words, they can't require any specific method of administrative exhaustion under your theory. No, I don't believe they can. Oh, my goodness. I don't think they have the authority to do that. So a letter to Sheriff Baca is fine, even if the rules say a letter to Sheriff Baca isn't fine. Yes, it's not. That's your view. And why not? Because Sheriff Baca doesn't get to make the rules on how you exhaust. He can make a suggestion. I don't think it's binding on anybody in the jail. It especially isn't binding for people who aren't still in the jail. How would they put it in the box? What would they do? Go to the jail and knock on the door and say, I want to get in and do it? Of course not. Well, I think you slid off the initial ground. But I take your position to be that Sheriff Baca is powerless to prescribe a binding administrative complaint procedure. Though that sounds hard, the way you put it, that is exactly my position because who says he gets to do that? Everywhere in the country where you have jails and prisons, regulations are put into effect. For example, with respect to the State of California and its 36 prisons, there's a 15-day filing requirement. Obviously, that doesn't apply because – and actually, I think the more direct and better answer to your original question is this. Sheriff Baca doesn't get to say that, but if you don't do it the way he prescribed to do it, then you've exhausted all your available remedies. I don't think you have to use the one that he gives you. I just don't see where that comes from. And what you're showing – let's assume that the rule is as you describe it, that is to say you have to exhaust all your available remedies, and if the drop-it-in-the-box is no longer available to you, then you can improvise. The letter to Sheriff Baca is clearly actual notice, and therefore that's enough. But let's take that version of the argument. Do you need to show that some version of the original administrative remedy is not available to you? That is to say, what showing is there that he can't deliver it to the jail? Say, listen, I want to do a complaint, and I understand I'm not in jail now, but I assume that I can file it now. And jail says it doesn't matter if it's late, but I want to – here, put it in the box for me. I know this isn't a matter dealing with construction contracts, but I think substantial compliance is sufficient compliance because nowhere does it say that it has to be done differently. Just because administrators of jails take it upon themselves within their systems to specify certain methods, there's nothing of which I know in the law that requires somebody to follow that method. All you've got to do is do it in a reasonable way, and it's not unreasonable to send a letter to Sheriff Baca because Sheriff Baca gets the letter, and then he gives it to the people who are supposed to do – As I recall, how was this sent to Sheriff Baca? I sent it to him, and I think I sent it certified mail to his home. That's what I mean. So you can – so I can send it to Don Rumsfeld at his home. Well, what you're doing is, respectfully, you're making an argument out of certum. You're making it even more – Well, no, I mean, I'm afraid I'm trying to replicate in the Federal setting precisely what you're doing here. I think the answer is yes. Yes, you could send it to Donald Rumsfeld because one would presume that Donald Rumsfeld would not throw it in the garbage. He would take it and send it where it's supposed to go to whoever would hand it. Why couldn't you send it to Donald Rumsfeld? And that's a rhetorical question. Of course you can send it to Donald Rumsfeld. What's the consequence of sending it to Donald Rumsfeld? The question is may you, not can you. Physically, you can. May you? Why not? Let's assume that you've exhausted. The standard you've got to satisfy is deliberate indifference. Correct. How do you satisfy that on the facts here? By showing through the evidence that's in the record that the jail was on notice before the riots occurred that something was going to happen, that something was going to happen to black inmates at the hands of Hispanic inmates, and nothing was done to segregate those inmates apart. Pardon me, counsel. Can you reference the testimony of Deputy Agat Kapafali? Kapafali, C-A-P-A-F-A-L-I, Edgar Kapafali. Do you have a site for that? I don't. The reason I don't is because, as the Court can see from my table, the records are voluminous, and I didn't go through the record and look for that in the last two days when I was there. Is that a declaration? Is that where it came from? I posed it. And I will submit to the Court a 28-J statement to make it easy and readily available to the Court. I'll do that when I get back to my office today and go through the record and find that. I took his deposition, and he indicated, with some hesitation and some resistance, as I recall, that there was information that this was going to happen. There's deliberate indifference because of the disparity in the populations and because there were many more Hispanic inmates there than black inmates, and that's the deliberate indifference. When did Kapafali say he got the information with respect to the first fight? Well, it wasn't a fight. It was a riot. It happened in different parts of the jail and the medical facility. Can you give me the timing, sir, please? It was before it occurred. I cannot point to the system. How long before it occurred? I do not recall. All right. Secondly, recently the Supreme Court of the United States has held, I believe, in a case called Johnson v. California. I was just going to mention that. The intentional segregation of Mexican-Americans or Hispanic-Americans from blacks for the purpose of screening and for temporary periods was unconstitutional. All right? I disagree with that respectfully. My understanding of the case is a little bit different than that, and I read it over the weekend. One of my friends, Burt Deitzler, actually got that ruling from the Supreme Court. My understanding of that case is that it was brought to stop the segregation, not between Mexican-Americans and African-Americans, but it was brought to stop the segregation of African-Americans upon their entry into various facilities for the purposes of screening them to see where a suitable placement would be for them. And what the court said was that the rule against discrimination applies within the prison system, but it applies with the caveat that a level of heightened scrutiny has to be given to that, but yet the prison system has the ability to do that. So I don't read the ruling as definitively. Strict scrutiny applies to racial segregation in the prison system in California, true? Yes, and ironically, the L.A. County jail system refuses to segregate inmates, so what the L.A. County jail system does is the flip side of what the state system is doing. Because one of our arguments in the district court before Judge Cooper was that the county jail system should in fact keep Hispanic and black inmates apart from one another, because when they're left together, the result is that the black inmates get beaten up. Is your argument on deliberate indifference that the deliberate indifference took place long before the specific warning here then? That is to say they should have known a long time ago and done the segregation a long time ago? Deliberate indifference is on two levels, the one that you just mentioned, Your Honor, and with respect to being on notice that these events were going to happen before they happened. I'm thinking now in response to Judge Bea's question, my recollection is at deposition that Deputy Capafalli indicated there was notice before the first occurrence. My recollection is not that there was notice that it was going to happen again, I believe, the next day or two days later. I'd like to reserve the seven minutes that I have left, if I may. Thank you. Good morning, Your Honors. Paul Beach for the defendants and appellees. I'm going to address the Capafalli issue. But I want to respond first to a few brief statements which were made during the opening argument, which is, number one, that L.A. County refuses to segregate. I do not believe that's an accurate representation of the record. I believe the record, you'll find it at Chief Moorhead's declaration in support of the summary judgment motion, where he addresses the segregation issue. With regard to Capafalli, supplemental excerpts of record 526 is a declaration submitted by Capafalli in support of the summary judgment motion, in that he established that he received information secondhand and only after the disturbances occurred. He was the criminal investigator who showed up to conduct a criminal investigation as a result of what occurred here. That's what Capafalli's role in the circumstances were. This report in granting the summary judgment found that the Capafalli evidence was entirely consistent with the other evidence submitted in support of the summary judgment motion, which was that the notice that members of the department, and again, members of the department, there is no nexus either in the summary judgment motion below or in the briefs in this Court. There is no nexus establishing how these defendants that are before this Court violated these plaintiffs' rights. Plaintiffs are trying to do a large leapfrog, which is that because people in the department knew, therefore, these defendants are not entitled to summary judgment. Under the standard established by the Supreme Court in Farmer, these defendants have to have knowledge, and I believe that the summary judgment motion, the admissible evidence before the Court was very clear that these defendants, each defendant submitted a declaration, including, in fact, we submitted in reply papers because we received requests for admissions after we filed our summary judgment motion. The plaintiffs admitted to Capafalli. There's a request for admission. They admitted that Capafalli did not violate their constitutional rights. That's in the record, a request for admission by the plaintiffs. Now, is your recollection of his deposition different than Mr. Yagman's? Yes, it is. And, in fact, Your Honor, my strong recollection is, is that the documents that the plaintiffs submitted in opposition to the summary judgment motion were not admissible, to which we prepared and filed lengthy evidentiary objections, which are in the record, and specifically that that portion of that evidence did not comply with this Court's ruling in Orr v. Bank of America, the admissibility requirements established by the Ninth Circuit. I believe that's like a 2002 case. But, in any event, getting back, the evidence was that they got a tip on the 24th that something might happen very quickly, and they tried to do the best they could to prevent it and, as soon as they put the place on lockdown, minutes later, a disturbance occurred and they tried their best. And these are members of the Department. Again, these are not even the individual defendants in this case. They weren't there when the disturbance started. So, there's one part, which is whether or not anybody from the Department did anything to these plaintiffs. And I don't believe that the admissible evidence before the District Court established that at all. But even if you assume that that had been established, in order for the summary judgment motion to have been denied, the plaintiffs still were required to establish causation, which is required under Section 1983 claims, that these defendants caused a violation of these plaintiffs' rights. And I respectfully submit, it's simply not in the record. Getting back to the discovery issues with regard to the dismissal, it wasn't brought up in argument, but I would, if the Court has any questions, I'd be happy to address the discovery dismissals. The long and short of it is, is that months went by, many months went by. There were multiple motions to compel. Eventually, the Court entered an order in February saying, okay, everybody show up pursuant to the schedule. Many did not. We filed a motion to compel. And in the Court's order granting that motion to compel, it granted it in part and denied it in part. It didn't throw out any of the plaintiffs. But it said, it said, okay, this is March. Show up by the end of June, doggone it, or you're going to be dismissed. And in the order, the order reflects that the plaintiffs who claimed that the defendants had been hiding information from them, that's absolutely not true. Supplemental excerpts of record, page 176. We turned over all the booking records that we had with regard to all of these plaintiffs. We turned it over to them, which had all their last known addresses, long before the Court entered its February 20 order. We turned it over. And they still had until June to show up for deposition. And they simply did not. So, and in the Court's order, which said, show up by June, it noted the fact that the Plaintiffs' Counsel had made, had represented to the Court, we've got 19 of the 20 out-of-custody plaintiffs' addresses right now. Now, well, that was in March. They still had until June to show up, and they still never showed up for deposition. With regard to the plaintiffs' attorney needed to have the defense tell them where their clients were? That was the argument they asserted. We respectfully disagreed that we had no obligation to tell the plaintiffs who their lawyers were and vice versa and how to keep in contact with each other. We brought up the fact that under the California Rules of Professional Responsibility, there's an affirmative obligation to maintain contact and communicate with your clients. And from the defendant's perspective, it really does not matter whether it was the plaintiff's fault or the plaintiff's counsel's fault. The long and short of it is that everybody here was seeking a million dollars each, and we were entitled to defend ourselves against these claims. And after six, I'm sorry, about nine months of trying to take depositions with getting nothing, then I don't believe that it was an abuse of discretion for the Court to impose the ruling that it did. And it sounds as though even though you might not have had an obligation, you did the best you could with the information you had to tell Mr. Yagman how to find his own clients. Absolutely, Your Honor. And, in fact, I'd like to bring up one specific issue, which is the Lee issue, where the accusation by the plaintiffs is that we somehow misrepresented that Mr. Lee was an out-of-custody plaintiff when, in fact, he was an in-custody plaintiff, and we made some sort of misrepresentation in the Court, and the Court mistakenly dismissed him, and that was an error. Well, number one, we received the information as to where Mr. Lee came from from plaintiffs themselves. There was a joint discovery plan, and the first step of the joint discovery plan was for the plaintiffs to tell the defendants where they were and whatnot, and with regard to, they listed all the plaintiffs, and they listed, you know, Avenal State Prison, Ironwood State Prison, various prisons. With regard to many of the plaintiffs, they didn't list anybody, and everybody concluded these are, there were 20 in custody and 20 out of custody. So we proceeded as though he were an out-of-custody person. Everybody proceeded as though he were an out-of-custody plaintiff. Then the Court proceeded. He didn't show up. He was dismissed. As it turns out, my recollection is that Lee had, at some point in time, gotten re-arrested again or something along those lines, and so what we were greeted with was an ex parte application, which we received no advance notice of, saying, you know, Mr. Lee was out of custody or was in custody and you guys didn't, you know, tell the court, so it was a mistake to throw it out. We just responded quickly, saying, don't, you know, we're entitled to a hearing on this, at least a motion and whatnot, to which the Court simply said, plaintiffs, file a motion and we'll take the matter, we'll consider the matter. Plaintiffs never did that. So Mr. Lee was never reinstated. I mean, first of all, he wasn't dismissed because of anything that the defendants did wrong, but second of all, if the plaintiffs really believed that he should have been reinstated, they could and should have simply filed a motion, which is what the district court asked them to do, but they never did so, and I don't know why. I don't want to repeat everything that's in our briefs. I believe we tried as best as we could to brief the issue very thoroughly, but I want to raise one issue, which is with regard to, because I received the reply. There are many statements in there which do not have record citations to them, and there are many statements in there that have record citations, which I respectfully suggest that if you look at the record citations, they don't necessarily stand for the proposition that is put forth in the papers, but in support of the summary judgment motion, there was meticulous detail put in in support of that motion, a very thorough separate statement, and in response, the arguments were, most of the arguments weren't even addressed in the opposition, including all the Monell issues, so based on the evidence that was in support of those, of these persons, I believe that the courts ran the summary judgment motion correctly, and also on the PLRA issue, they now claim in their briefs that these individual claimants submitted claims and complained verbally and all that sort of stuff. That argument was never presented to the district court. In opposition to the motion to dismiss the PLRA plaintiffs, that argument that the plaintiffs had individually complained either in writing or verbally, that argument was never presented to the district court below, so we never addressed it and the district court never addressed it. It simply wasn't presented below, and actually, I'll give you the record. The plaintiffs' records are 315 through, excerpts of record 315 through 319. That was what plaintiffs argued below, and they didn't argue, well, we all voiced a complaint and things like that. If you have any additional questions, I'd be happy to respond. Otherwise, I'm sorry. Roberts. I think not. Thank you. Mr. Yagman, you've saved a little time. Yagman. Because there's de novo review of what happened on summary judgment, in a way it doesn't make any difference what I have to say about this, because the court will review the same papers that were before the district court. Now, let me say something about that. It's extraordinarily difficult for us to review a record on a record for summary judgment without some help from the lawyers, and I don't think we've gotten enough help from you. That is to say, it's very difficult for us to get into this record without citation at every point on anything that you think is important, have it be accurate and so on. I just don't think you fulfilled your responsibilities to us in terms of the summary judgment motion. Well, I take responsibility for it, but unfortunately I didn't write the briefs in this case. It was done by another partner in the firm who's since retired, so I'm stuck with the briefs that were filed. I apologize to the court if the court finds them deficient as it does, but there isn't anything that I'm able to do about that at the present point. I'm stuck with those briefs. Let me just comment on one thing, and it's this. With respect to plaintiffs who were missing and who couldn't be found, we presently have a case in our office that we've settled for about a million dollars. Our client was in prison until last September. We're unable to find him. Our law firm frequently takes cases from people who are incarcerated. When we sign them up, we tell them firmly and we give them written instructions, you always have to tell us where you are. Not all of them do that. We end up getting stuck with that. It's not because of any negligence on our part. This one client whose case we just settled, we've been trying to find him since last September. He's on parole. He's at large. There's a warrant out for his arrest. We frequently lose clients in jail cases. Since the occurrences in this case, we've taken many, many fewer of these cases because they've turned out to be a big headache. So, therefore, you don't really object on this appeal to the 15 dismissals for failure to comply with discovery under Federal Rule 37? I really do object because I must object. Do I think that dismissing them was irrational? Of course not. But I'm not going to take a position as any of our clients. When I hear a person who's accused of something heinous who says, I resent that remark, but I don't deny it. Well, I'm not going to characterize it like that. I have an obligation, zealously, to represent the clients whom I am here representing. So I'm not going to make that concession because I don't think it's warranted to make that concession. Do I think that Judge Cooper did something irrational by doing that? Of course not. I can't and I won't say that. I'm stuck with the record. I have, and it's not the best record. It's one of the worst records I've ever had. And I'd be an idiot to stand here and say something different than that. How about the dismissal of the three who would not answer questions on depositions? Same position? What can I say? I wasn't at the depositions, I don't think. And I have the record that I have, and there's nothing I can do to change it. How about the denial of the motion to reconsider the magistrate's denial of your motion to compel further answer to interrogatories? Do you find that to be clearly erroneous? I don't know. I mean, eventually the hole that you're digging for me, Judge Beyers. No, no, I'm just going down the list. You won't be able to see me. Well, I'm only going down the list of issues which are raised on appeal. And I want to know exactly what we have to have a conference on later on and what we can say. Well, this doesn't seem to be a very contentious issue. It's not happy to be flagellated, but here I am. I'm the lawyer for the plaintiffs. Don't take it personally. No, I don't. I don't mean that personally. I mean it figuratively. Obviously, I'm not being whipped. How about the supervisors of the County of Los Angeles? The court found there was no tribal issue that they ever voted to indemnify the sheriff's punitive damage awards. I don't think we've presented sufficient evidence on that. We have new evidence now in some other cases, but the record wasn't sufficiently developed at that time. There's no question about that. You're still preserving the PLRA claims and the substantive claims, right? That's what you're still on. Of course. There's also a denial of motion to reconsider for one plaintiff. Mr. Lee? Yeah. That's Lee. Okay. I think I've got the picture. I take it that a number of those questions were rhetorical and that I need not respond. Well, no, no. I just wanted to know what we really have to decide and look into more carefully and what issues are not. The important issues that we made to the plaintiffs are the PLRA exhaustion requirement and the substantive claims. And I point out in concluding that Sheriff Baca is the person who's responsible for what happened here. And what I'm hearing in the defense argument is that while these individual plaintiffs, meaning the ones other than Sheriff Baca, aren't responsible and that therefore Sheriff Baca is responsible, the flip side of the rule that police have collective knowledge of what all police know, I think, is that when you're in charge and you're Sheriff Baca, it's imputed to you what the people who are working for you and who you charge with doing things. Now, you can't say that Sheriff Baca isn't responsible because he didn't have actual knowledge. He had constructive knowledge of the fact that these disturbances or riots would take place, and he also knew very well that he refused to segregate black inmates from Hispanic inmates and that the problem of Hispanic inmates overwhelming and beating up black inmates had been going on for years, for some years, in the jail system. That something should have been done about that. Using the excuse that, well, we can't segregate within the jails doesn't really cut it because when one racial group is having hostilities with another, there's a valid basis that would meet the heightened scrutiny standard for segregating between those two groups. Thank you. You said that one of your partners has retired. Which one was that? I'm sorry? One of your partners has retired. Which one? Katherine Bloomfield, the partner who wrote these briefs and who principally was responsible for this case. She now lives in Shreveport, Louisiana. She has my sympathy. That's where she comes from, and happily for her, she's not here today. I am. It's my recollection there's an old story that in Louisiana someone who makes allegations is called an alligator. So she's been back with the alligators. Okay. I'll ask her, and I'm sure when she listens to the argument that will be up on the court's website tomorrow at noon, she'll appreciate what you said. Okay. Thank you very much. Thank both sides for the argument. The two appeals in Moore v. Baca and Bayonne v. Baca are now submitted for decision. We have one remaining case on the argument calendar this morning, Matthews Studio Equipment Group v. Phillips.
judges: T.G. Nelson, W. Fletcher, Bea